UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TERESA L. SIMMONS,

                                   Plaintiff,

          v.                                                7:05-CV-644
                                                                (GLS/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.
_____

PETER L. WALTON, ESQ., for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

     This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).

## PROCEDURAL HISTORY

     Plaintiff filed an application for Supplemental Security Income (SSI) benefits

on November 3, 2003. (Administrative Transcript ("T."), 103, 304). The application

was denied initially, and a request was made for a hearing. A hearing was held before

an Administrative Law Judge ("ALJ") on September 21, 2004. (T. 302-327). In a

decision dated October 18, 2004, the ALJ found that plaintiff was not disabled. (T. 77-

84). The ALJ's decision became the final decision of the Commissioner when the

Appeals Council denied plaintiff's request for review on April 1, 2005. (T. 67-69).

     Plaintiff's federal complaint was filed on May 26, 2005. (Dkt. No. 1). In the

meantime, on March 1, 2005 and March 29, 2005, plaintiff's counsel had submitted

additional medical records that the Appeals Council had failed to consider prior to issuing its denial of plaintiff's request for review. *See* (T. 4-14, 15-66). While this action was pending, but before the defendant filed the transcript, the Appeals Council recognized that it had not reviewed the additional documentation. (T. 3). On June 20. 2005, the Appeals Council wrote to plaintiff's attorney, acknowledging that it had received the plaintiff's March 1, 2005 letter, together with the attached medical records. (T. 3).

In the letter to counsel, the Appeals Council indicated that although the federal action was pending, the Appeals Council reviewed the additional medical evidence, but that neither the evidence nor the plaintiff's contentions "provide[d] a basis for changing the [ALJ's] decision." (T. 3). This letter, together with the additional medical records were included in the Administrative Record, thus, the court may examine these documents in making its recommendation.

## CONTENTIONS

The plaintiff makes the following claims:

(1) The Commissioner failed to properly assess plaintiff's subjective allegations of pain and disabling symptoms. (Brief, p. 12).

(2) The Commissioner failed to properly assess plaintiff's Residual Functional Capacity. (Brief, p. 18).

(3) The Commissioner's decision that plaintiff can perform substantial gainful activity is not supported by substantial evidence in the record. (Brief, p. 20).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record and must be affirmed.

## FACTS

### A. **Non-Medical Evidence and Testimony**:

Plaintiff, who was forty years old at the time of the ALJ's hearing, has almost no work history. (T. 306). Her only work consisted of work as a nurse's aid for approximately one year. (T. 305). That work consisted of caring for elderly patients and involved heavy lifting and moving of those patients. (T. 306). Plaintiff testified at her ALJ hearing that she stopped work during 1991, (T. 306), but her written application states that she stopped work on June 4, 2003. (T. 112).

At the September 21, 2004 hearing, plaintiff testified that she has constant daily pain in many areas of her body, including her head, shoulder, arms, legs, and neck. (T. 306). She also stated that her "burning" pain travels from her neck into her head, and results in many problems including blurred vision (T. 307), fatigue, slow reactions, inability to concentrate, and inability to get simple things done. (T. 112). In a report submitted to the Social Security Administration during late October 2003, plaintiff stated that she has been unable to work since June 4, 2003. (T. 112). During her testimony at the ALJ hearing, plaintiff testified that she last worked during 1991 but qualified that statement, "I believe it was [1991]." (T. 306). In her testimony, plaintiff again stated that she experiences many side effects from her medications including weakness, confusion, dizziness, fatigue, and blurred vision. (T. 308). She testified that she is taking many different medications to counteract her arthritis,

3

fibromyalgia, headaches, and high cholesterol.  These medications include Neurontin,

Bextra, Skelaxin, Tylenol with Codeine, Protonix, Zoloft, and Lipitor.  (T. 307).

Plaintiff stated that on a typical day, she will try to get some housework done,

may take her dogs for a walk, but then becomes weak, tired, and exhausted, and will

return to her bed or a couch to rest. (T. 309, 313).  Plaintiff testified that she is very

depressed over her pain and inability to accomplish what she previously could do. (T.

310).  She stated that she cannot walk for lengthy time periods without resting, and

can sit for only fifteen minutes at a time because of the pain in her legs and knee. (T.

315).  Plaintiff stated that the medications she is taking reduce her pain, but she still

has high pain levels measuring seven or eight on a scale of ten. (T. 320).  When

questioned by the ALJ about Dr. Quereshy's office notes which show pain levels

between zero and three on a scale of ten (T. 318, 319), plaintiff stated that Dr.

Quereshy's treatments (injections for nerve blocks) helped her, but only reduced the

pain in her neck and shoulders. (T. 319).

Plaintiff testified that she is able to take care of her personal needs (T. 321), but

does not engage in any organized social activities or belong to social groups (T. 323).

She stated that some days she does not get out of bed. (T. 324).  At the hearing, the

ALJ asked plaintiff which medications helped her the most, and she answered that

these medications were Bextra and Zoloft. (T. 321).  Plaintiff then stated that the

Zoloft helped with the palpitations and panic attacks that she had been experiencing.

4

(T. 321).  The ALJ asked plaintiff if the palpitations and panic attacks were plaintiff's "reaction to the pain," but confirmed that she was not in counseling for any psychiatric illness. (T. 321-22).  Then the ALJ stated "you're not on any psychiatric medication for your emotions." (T. 322).  The plaintiff stated "[u]h-uh." (T. 322).  The ALJ states in his opinion that plaintiff  " . . . is not undergoing any type of formal counseling or *treatment*.."  (T. 78)(emphasis added).

A vocational expert ("VE") testified at the hearing but did not respond to hypothetical questions. (T. 325-26).  The ALJ stated that he was not using hypothetical questions because the issue was " . . . whether one could sustain light or sedentary work . . . ." (T. 326).  Instead, the ALJ asked the VE whether plaintiff would be able to work if the ALJ found plaintiff's testimony credible " . . . in the sense of the pain level and the need to lie down . . . ." (T. 325).  The VE responded that if plaintiff's testimony were credible, she would not be able to perform any jobs that were identified.  (T. 326).  It is unclear what jobs, if any, were identified by the VE since he did not testify to any jobs that were "identified" and there is no written report in the record that identified any jobs that plaintiff could perform. (T. 325-26).

Plaintiff's counsel did ask the VE a brief hypothetical question. (T. 326).  The attorney's hypothetical asked the VE to consider an individual of plaintiff's age, with plaintiff's educational background, who was taking codeine and three other muscle relaxants per day. (T. 326).  Counsel also asked the VE to assume that this individual

suffered side-effects from those medications, consisting of fatigue and inability to concentrate. (T. 326). Further, counsel asked the VE to assume that plaintiff needed to lie down frequently during the day. (T. 326). In response to this hypothetical, the VE stated that plaintiff would not be able to perform any work. (T. 326).

## B. **Medical Evidence**:

During December of 2002, plaintiff was referred to Dr. Charles Wasicek, a rheumatologist, for complaints of aching feet and ankles. (T. 257). Dr. Wasicek did a thorough physical including range of motion tests, and found tenderness over plaintiff's ankles, some tenderness over her lumbosacral junction, and tenderness at another joint. (T. 258). Dr. Wasicek was concerned over the possibility of connective tissue disease since plaintiff had "multiple joint involvement." (T. 258). Dr. Wasicek ordered many types of blood and other tests (T. 258) and prescribed the medication Vioxx. X-Rays of plaintiff's lumbar spine of December 3, 2002 showed mild sacroiliac sclerosis of the L5-S1 joints. (T. 151-52).

Plaintiff returned to Dr. Wasicek on January 13, 2003, complaining about pain in both knees. She stated that the Vioxx had reduced the pain in her hands, ankles, feet, and heels. (T. 255). Dr. Wasicek stated that plaintiff's x-rays showed osteoarthritis in her knees, and on examination, he found some limitation of flexion in her lower back and discussed a procedure called vicosupplementation. (T. 255).

Approximately two weeks later, on January 28, 2003, plaintiff began treatment

with Dr. Sarosh Quereshy, a specialist in pain management. (T. 170).  Dr. Quereshy

treated plaintiff monthly between January of 2003 (T. 170) and the end of September

2003 (T. 161).  During January and February of 2003, Dr. Quereshy found objective

signs of pain, including a positive cervical compression test, tenderness, and

dysesthesia.[1] (T. 170).  Dr. Quereshy administered somatic nerve block injections

during January and February of 2003. (T. 170, 169).  These injections improved

plaintiff's neck and reduced her pain. (T. 168, 167).  Dr. Quereshy's notes in March of

2003 state that plaintiff had significant improvement since her February 2003 visit

with decreased neck stiffness and a pain level of three on a scale of ten. (T. 167).  Dr.

Quereshy stated that plaintiff's condition was improving, and she should reserve the

nerve block injections for only severe exacerbations of her neck pain. (T. 167).

Plaintiff's improvement continued into May of 2003, and Dr. Quereshy's notes again

indicate "significant improvement." (T. 166).

During June of 2003, plaintiff saw Dr. Quereshy three times. (T. 165, 164, 162).

On June 2, 2003, plaintiff was again having pain, numbness, and tingling. (T. 165).

Plaintiff reported sleeplessness and lack of appetite related to serve episodes of pain.

(T. 165).  She also reported a "general malaise," secondary to pain which was also

leading to a sense of weakness and fatigue. (T. 160).  Dr. Quereshy found a moderate

---

[1] Dysesthesia is a painful, persistent sensation induced by a gentle touch of the skin.
DORLANDS MEDICAL DICTIONARY 221 (Shorter Ed.1980).  This painful sensation may be caused
by nerve damage. THE BANTAM MEDICAL DICTIONARY 132 (Revised Ed. 1990).

to severe decrease in cervical range of motion as well as muscle guarding and spasm. (T. 165).

On June 9, 2003, plaintiff was again complaining of the same symptoms, and Dr. Quereshy's notes were almost identical with regard to his findings as the June 2 notes. (T. 164). Plaintiff was administered nerve block injections again on June 9, 2003. (T. 164). When plaintiff returned to see Dr. Quereshy on June 16, 2003, plaintiff reported significant improvement in her symptoms, with decreased neck stiffness in the range of motion and a pain level of "2/10." (T. 162). Nevertheless, Dr. Quereshy found positive results on certain tests. (T. 162). During September of 2003, plaintiff's improvement continued, and although Dr. Quereshy found evidence of pain, plaintiff reported that her pain level was zero on a scale of ten. (T. 161).

During May of 2003, while being treated by Dr. Quereshy, plaintiff began with a new primary care physician, Dr. Shirley Tuttle-Malone. (T. 184). Dr. Tuttle-Malone diagnosed plaintiff as having hypertension, high cholesterol, polyarthralgia, and diffuse tenderness which raised suspicions of fibromyalgia. (T. 184). Dr. Tuttle-Malone stated that although plaintiff did not have signs of depression, she would prescribe Zoloft "to see if it helps in terms of her chronic pain." (T. 184).

On June 16, 2003, one of the same days that plaintiff saw Dr. Quereshy for injections, she also saw Dr. Tuttle-Malone. (T. 183). Plaintiff told Dr. Malone that the injections did not give her much relief. (T. 183). Plaintiff reported daily palpitations,

and Dr. Tuttle-Malone stated that plaintiff seemed to have some improvement with the Zoloft, but she was still having anxiety, "possibly related to her pain syndrome." (T. 183). Plaintiff also reported having panic attacks, and Dr. Tuttle-Malone increased plaintiff's dosage of Zoloft, and increased the dosage of Neurontin. (T. 181). The Administrative Transcript contains records of Dr. Tuttle-Malone's treatment between March and November of 2003 (T. 177-186), and between January of 2004 (T. 278) and August of 2004. (T. 266).

During the treatment between March and November of 2003, Dr. Tuttle-Malone treated plaintiff for high blood pressure, panic disorder, headaches, and monitored her progress with specialists, Dr. Wasicek and Dr. Quereshy. (T. 175-199). By the end of November 2003, Dr. Tuttle-Malone's office notes show that plaintiff's panic disorder was under "excellent control" and her high blood pressure was under "good control" as were plaintiff's complaints about migraines. (T. 175).

Dr. Tuttle-Malone believed that plaintiff had polyosteoarthritis in many joints, and began to believe that plaintiff had fibromyalgia. (T. 186, 184, 183). Her office notes indicate that plaintiff's knee and neck arthritis were improving during August of 2003, but that plaintiff still had some neck pain and generalized aching in November of 2003. (T. 175). Dr. Tuttle-Malone's notes from January 6, 2004 state that plaintiff had "multiple trigger points and multiple areas of tenderness in the musculoskeletal system." (T. 278). In February of 2004, plaintiff was complaining of increased pain in

her back, neck, shoulders, knees, ankles, and hips. (T. 276).  Plaintiff also complained of fatigue. (T. 276).  An examination at that time showed diffuse tenderness in many joints, but no swelling or synovitis.  On August 16, 2004, Dr. Tuttle-Malone noted that plaintiff was averaging two Tylenol with Codeine tablets per day and sometimes taking four tablets in one day. (T. 266).

Dr. Tuttle-Malone believed that plaintiff had generalized osteoarthritis, fibromyalgia, fatigue, and depression.  (T. 276, 274, 272, 268, 266).  In June of 2004, an MRI of plaintiff's cervical spine showed mild diffuse degenerative disc changes at levels C3-4, C4-5, and C5-6. (T. 271).  On May 5, 2004, Dr. Tuttle-Malone stated that plaintiff's diffuse tenderness was "certainly" characteristic of fibromyalgia. (T. 272).

On January 14, 2004, plaintiff was consultatively examined by Dr. Charles Moehs. (T. 204).  Dr. Moehs reported that plaintiff stated she could walk up to a mile, but usually walked less than one mile, could grocery shop, climb stairs, and could take care of housework, cooking, and personal hygiene. (T. 204).  Dr. Moehs found stiffness in most of plaintiff's joints, and decreased range of motion in plaintiff's shoulders, knees, lumbar spine, and ankle. (T. 206-207).  Dr. Moehs concluded that plaintiff had generalized arthritis, and could possibly have rheumatoid arthritis.  (T. 205).

Approximately one month later, plaintiff was examined by a psychologist who found that plaintiff's anxiety related disorder was not severe, that her panic disorder

was currently under control, and that plaintiff did not meet any of the criteria of the listed impairments. (T. 210-222).

On January 27, 2004, a disability analyst for the Social Security Administration reviewed the record, and found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand for two hours, and sit for two hours. (T. 224).

During early 2005, plaintiff was treated by Dr. Robert Martinucci, a physician at Lewis County General Hospital who specializes in pain management. (T. 17-21, 54, 61). Dr. Martinucci found extremely limited ranges of motion in plaintiff's spine and some limitations in plaintiff's shoulder. (T. 21). Dr. Martinucci administered "trigger point" injections to reduce plaintiff's pain. Dr. Martinucci concluded that plaintiff has fibromyalgia. (T. 20).

## DISCUSSION

### 1.  <u>Disability Standard</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering

11

his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

**2.    <u>Scope of Review</u>**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.

However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

### 3.   **Residual Functional Capacity and Credibility**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

Plaintiff argues that the ALJ did not follow the regulations and Social Security Ruling 96-8p in arriving at the RFC assessment.  The ALJ found that plaintiff could perform sedentary work  (T. 81), but the basis of that finding is unclear.  The only physical RFC assessment in the file was prepared by a ***non-physician*** disability analyst. (T. 224-231).  The ALJ's opinion first states that he has "considered the assessment made by a medical physician with the Disability Determination Service." (T. 81).  The ALJ then states that this "medical physician" finds that plaintiff could

perform "light work," but then states that "the undersigned reduces this down to the sedentary level." (T. 81).

The court notes first that although the ALJ states that the RFC was completed by a physician, it was in fact completed by a person who is not a physician. Since a physician's opinion would be entitled to more weight than a "disability analyst," the ALJ's reliance upon this opinion is error that could in itself require reversal. However, the ALJ then states that even though this individual, who the ALJ thinks is a physician, states that plaintiff can perform light work, the ALJ reduces the exertional level to sedentary. While it is true that it is the province of the ALJ to determine RFC,[2] the ALJ must base this finding on substantial evidence.

The ALJ then states that in assessing the plaintiff's RFC, he has also considered her "credibility" and finds that plaintiff's claims of symptoms and limitations are not fully credible. (T. 81-82). Plaintiff argues that the Commissioner also erred in finding that plaintiff's complaints were not fully credible.

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two

---

[2] 20 C.F.R. § 416.946(c).

step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929;

*see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y.

March 3, 1998).

 First, the ALJ must determine, based upon the claimant's objective medical

evidence, whether the medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a).

Second, if the medical evidence alone establishes the existence of such impairments,

then the ALJ need only evaluate the intensity, persistence, and limiting effects of a

claimant's symptoms to determine the extent to which it limits the claimant's capacity

to work. *Id.* §§ 404.1529(c), 416.929(c).

 When the objective evidence alone does not substantiate the intensity,

persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light of

the following symptom-related factors: (1) claimant's daily activities; (2) location,

duration, frequency, and intensity of claimant's symptoms; (3) precipitating and

aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication

taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any

measures taken by the claimant to relieve symptoms; and (7) any other factors

concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§

404.1529(c)(3), 416.929(c)(3).

 Plaintiff argues that her treating physicians have not cast any doubt on her

physical ailments, and that there have been many findings of objective signs and

16

symptoms supporting her complaints of pain.  The ALJ cites the fact that some of Dr.

Queresky's notes state that plaintiff's pain was 0/10 and 3/10 with treatment.

However, this completely ignores the fact that the pain relief was only temporary and

the nerve blocks that Dr. Quereshy administered were only for the plaintiff's cervical

area.  The court notes that on December 23, 2003, plaintiff reported that the pain was

0/10, but plaintiff returned for more shots on March 18, 2004, March 25, 2004, and

April 1, 2004, complaining of moderate to severe neck pain. (T. 299, 300).  On April

15, 2004, plaintiff again reported pain of 0/10. (T. 297).  On May 5, 2004, Dr. Tuttle-

Malone stated that plaintiff had more than a year of "conservative treatment" with Dr.

Quereshy, and "numerous injections without improvement." (T. 272).

The ALJ states then states that "[p]hysical examination findings are not too

impressive." (T. 81).  It is unclear how the ALJ would be able to make this conclusion.

It does not appear that he is citing to the record.  The court must point out that the ALJ

cannot make medical judgments and cannot arbitrarily substitute his own judgment for

competent medical opinion. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).  The

ALJ also states that "[t]here is no evidence of any trigger points to support the

diagnosis of fibromyalgia." (T. 82).  First, is unclear how the ALJ concludes that

trigger points are necessary to support a diagnosis of fibromyalgia, and second, the

record is clear that on May 5, 2004, Dr. Tuttle-Malone stated that plaintiff did have

"***multiple trigger points***." (T. 272)(emphasis added).  Plaintiff's treating physician,

Dr. Shirley Tuttle-Malone and another treating specialist, Dr. Robert Martinucci, both

diagnosed plaintiff as having fibromyalgia. (T. 17-20, 54, 61, 175).  The ALJ's

17

statement is also confusing because he ultimately finds that one of plaintiff's severe impairments is fibromyalgia. (T. 83).

Additionally, in *Green-Younger v. Barnhart*, 335 F.3d 99, 108-109 (2d Cir. 2003), the Second Circuit recognized that fibromyalgia can be a disabling impairment, and that an ALJ's reliance on a "lack of objective evidence" in rejecting a plaintiff's claims was error. *Green-Younger* supports a finding that in cases of fibromyalgia, lack of physical findings do not undercut a plaintiff's credibility. On May 5, 2004, Dr. Tuttle-Malone stated that "I really think that she has fibromyalgia." (T. 272). Dr. Tuttle-Malone stated that plaintiff's "diffuse tenderness certainly is characteristic of fibromyalgia." Dr. Tuttle-Malone also stated that plaintiff also had arthritis in her knee, as well as cervical and perhaps lumbar radiculopathy. *Id.*

The ALJ also states that plaintiff's "many medications" appear to be prescribed "based on her complaints and not upon the objective evidence of record." (T. 82). Once again, it is absolutely ***unclear*** how the ALJ comes to this conclusion. The ALJ is rendering a medical opinion which is not qualified or entitled to do. *Balsamo, supra.* None of the doctors questioned plaintiff's need for the medications that they prescribed. Plaintiff has been treated by a specialist in rheumatoid arthritis, Dr. Wasicek, and a specialist in pain management, Dr. Quereshy, in addition to Dr. Martinucci, another pain specialist. ***All*** of these physicians, including plaintiff's treating physician, have found objective signs and symptoms and positive tests verifying plaintiff's complaints of pain.

While it is true that there are inconsistencies in the record regarding plaintiff's

reports of her levels of pain, especially her reports to Dr. Quereshy versus her reports to Dr. Tuttle-Malone, the ALJ did not analyze these inconsistent reports, and his conclusion about plaintiff's credibility is *not supported* by reference to substantial evidence in the record.

The ALJ further states that there are no side effects of plaintiff's medications mentioned in the record. (T. 82).  Dr. Tuttle-Malone's notes do show that she changed plaintiff's medications to lessen some of the side effects of one or more medications. (T. 266, 276).  Obviously if Dr. Tuttle-Malone did not believe these side effects were possible from the medications prescribed, she would not have changed plaintiff's medications to reduce the side effects from one or more of the medications.  The ALJ's statement that there are no side effects "mentioned in the records" is not supported by substantial evidence in the record.

It is clear that the ALJ's finding that plaintiff could do sedentary work was, in part, based upon his determination that plaintiff's claims were not credible, thus, *both* the ALJ's RFC evaluation and his credibility assessment are not supported by substantial evidence.

## 5.   __Vocational Expert__

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations or plaintiff's ability to perform the full range of an exertional category of work is significantly limited in any way, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir.

1986).  If the plaintiff's full range of a particular exertional category of work is significantly limited, then the ALJ must present the testimony of a vocational expert (VE) or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.*  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[3] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony. *See De Leon v. Secretary of Health and Human Services.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based his or her opinion." Dumas, 712 F.2d at 1554.

In this case, plaintiff argues that the record does not contain substantial evidence to show that plaintiff can perform substantial, gainful activity. (Brief, 20-22). Although the ALJ took the testimony of a VE at the hearing, he only mentioned the VE's testimony that plaintiff's prior work constituted "medium" work. (T. 82).  The ALJ then used the medical vocational guidelines in his decision that plaintiff could

---

[3] *Dumas*, 712 F.2d at 1554 n.4.

perform other work in the national economy at the sedentary level. (T. 83).  The ALJ did not consider that plaintiff had any mental impairments that were severe. (T. 79). Thus, the ALJ did not consider plaintiff's panic attacks or anxiety in his determination of RFC.  The court agrees that the record shows that although plaintiff is taking medication for her panic attacks and her palpitations, these symptoms are under excellent control, and the ALJ's finding that any "mental" impairment is not severe is supported by substantial evidence.

Even if plaintiff's mental impairment did not significantly reduce the exertional range of work that she could perform, it is still possible that the range of work would be reduced by plaintiff's inability to sit for the required amount of time for sedentary work or an inability to perform the full range of any other requirement for sedentary work.  The VE's testimony in this case was unclear, and the ALJ did not appear to use the VE's testimony regarding alternate work.

However, since the ALJ did not properly consider plaintiff's RFC and did not properly consider plaintiff's credibility, this court cannot even determine whether the plaintiff can perform sedentary work, whether the full range of sedentary work would be limited, whether a VE would be necessary, and if so, what questions would be appropriate.  If upon remand, it is determined that plaintiff cannot perform the full range of sedentary work, then a VE would be required to testify if there were any other jobs that plaintiff could perform, using a proper hypothetical question.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **REVERSED and**

**REMANDED** under sentence four of 42 U.S.C. § 405(g) for a proper determination of plaintiff's credibility and RFC consistent with this recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 27, 2007

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

22